IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| STATE AUTO PROPERTY AND CASUALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| BOARDWALK APARTMENTS, L.C., | ) ) Case No. 06-00252-CV-W-NKL |
| Defendant and Third-Party Plaintiff, | ) ) ) |
| v. | ) ) |
| T.S.A., INC., d/b/a THE SLOAN AGENCY, | ) ) |
| Third-Party Defendant. | ) |

**ORDER**

Plaintiff State Auto Property and Casualty Insurance Company ("State Auto") filed this declaratory judgment complaint against Defendant Boardwalk Apartments, L.C. ("Boardwalk"), alleging it has fulfilled its obligations under its insurance policy issued to Boardwalk for a nine building apartment complex in Lawrence, Kansas. Boardwalk counterclaimed for breach of contract. Boardwalk also sued Third-Party Defendant T.S.A., Inc. (the "Sloan Agency"), for failing to procure replacement cost insurance that would cover the true replacement cost of Boardwalk's apartment complex. State Auto moves for summary judgment against Boardwalk [Doc. # 109]; Boardwalk moves for partial summary judgment against State Auto [Doc. # 115]; and the Sloan Agency moves for summary

1

judgment against Boardwalk [Doc. # 111]. This Court now grants summary judgment in favor of the Sloan Agency, and partial summary judgment in favor of State Auto and Boardwalk. Finally, the Court denies State Auto's motion for leave to file its sur-reply [Doc. # 145], and denies Boardwalk's motion in limine [Doc. # 114]. The Sloan Agency's motion to continue trial [Doc. # 149] is denied as MOOT.

## I.      Facts

On October 7, 2005, one of the nine buildings ("Building 1") comprising the Boardwalk apartment complex in Lawrence, Kansas, burned to the ground and another building ("Building 4") was partially damaged. At the time of the fire, the apartment complex was insured by State Auto under a policy obtained through the Sloan Agency. To date, State Auto has paid $2,240,124.17 to Boardwalk under the policy; Boardwalk insists, however, that it is entitled to the entire $7.387 million (after applying the 4% inflation guard), which is the coverage limit for the blanket policy on all nine buildings.

The Boardwalk apartment complex was built in 1963. Terrace Management Services, LLC ("Terrace"), provides management services for the Boardwalk apartment complex, which it has done since 1997. Richard Moseley is the president of Terrace. The property management agreement appoints Terrace as the exclusive agent for Boardwalk for the purposes of managing the apartment complex. Under the agreement, Terrace acquired insurance coverage for the Boardwalk apartment complex on an annual basis, which it did through the Sloan Agency. The Sloan Agency is a non-captive, independent agency that obtains property and casualty insurance for its clients. David Moseley (Richard Moseley's

2

son) was the Sloan Agency agent who worked directly with Terrace, helping it obtain insurance for Boardwalk.

On January 16, 2004, the Sloan Agency prepared an application in order to obtain insurance on the Boardwalk apartment complex. That application, submitted to State Auto by the Sloan Agency with the authority of Boardwalk, reflected $2.1 million as the value for Building 1. Also, as part of this application, the Sloan Agency submitted a Statement of Values prepared January 16, 2004, by Westrope & Associates, a previous insurance agent, which also listed Building 1 with a value of $2.1 million. It is unclear when this Statement of Values was submitted to State Auto, but David Moseley states it was provided as part of the procurement process with State Auto, "either prior or shortly after."

It is undisputed that Richard and David generally discussed insurance coverage for Boardwalk on an annual basis and that figures similar to the ones in the Statement of Values had been used in previous insurance applications which Richard had reviewed. Richard often supplied information regarding the apartment complex to the Sloan Agency, and David would contact Richard for any other information he needed. However, Richard Moseley did not know what the actual replacement costs would be for the apartment complex, and thus he consistently relied on David Moseley to determine those replacement costs.

After receiving the application and the 2004 Statement of Values, State Auto issued Boardwalk a policy effective February 12, 2005, through February 12, 2006. In September of 2005, the Sloan Agency prepared another Statement of Values that was provided to State Auto after it requested the statement for its files. David Moseley was told the 2005

3

Statement of Values was "for underwriting purposes, pricing the policy, being able to determine if it meets guidelines as far as values per building." The information on the 2005 Statement of Values, including the $2.1 million replacement cost for Building 1, was taken from the application. The 2005 Statement of Values includes Richard Moseley's signature, although it was actually signed by David Moseley with his father's permission. The Statement of Values also lists the policy number, but it does not say it is incorporated into the original policy.

State Auto issued two copies of the Policy to the Sloan Agency, one for the agent and one for Terrace. The agent's copy included several "Commercial Property Renewal Worksheet"; Terrace's copy did not. The worksheet for Building 1, which was only attached to the agent's copy, states its description as "Blanket Apartments - 76 Units" and "Subject of Insurance: Blanket Building." It also states an "Amount of Insurance" of $2,184,000. Testimony explains that these worksheets contained information that would not normally be provided to the insured unless the insured wanted to see the agent's commissions. The policy's declarations page does not list the individual building's replacement costs. Nowhere in the policy does it incorporate by reference any Statement of Value, nor does it reflect that the value of Building 1 is $2.1 million. The only amount of insurance identified in the policy was $7.3 million which was the limit of the blanket policy.

After the October 7, 2005, fire, Patrick Bello, a State Auto claims adjuster, estimated that the replacement cost of Building 1 was $4,091,054.78. State Auto proceeded to pay

Boardwalk $2.1 million based on the replacement cost outlined in the Statements of Value, as well as under the Kansas Valued Policy Statute, Kan. Stat. Ann. § 40-905.

## II.    Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences."  *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial.   *Anderson*, 477 U.S. at 248.  However, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment."  *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983)).

## III.     Discussion

### A.     Insurance Policy Between State Auto and Boardwalk

#### 1.     *Kansas Valued Property Statute*[1]

The first issue to be resolved is whether the Kansas Valued Policy Statute controls the resolution of this dispute.  The Kansas Valued Policy Statute provides:

> Whenever any policy of insurance or an increase in the amount of coverage in an existing policy of insurance shall be written to insure any improvements upon real property in this state against loss by fire, tornado, windstorm or lightning, and the property insured shall be wholly destroyed, without criminal fault on the part of the insured or the insured's assigns, the amount of insurance written in such policy shall be taken conclusively to be the true value of the property insured, and the true amount of loss and measure of damages, and the payment of money as a premium for insurance shall be prima facie evidence that the party paying for such insurance is the owner of the property insured.

Kan. Stat. Ann. § 40-905(a)(1).

State Auto argues that the policy's coverage for Building 1 is limited to $2.1 million, because that is the value identified by the insured in the Statements of Value.  Therefore, the Kansas Valued Policy Statute precludes a different valuation for Building 1.  Boardwalk argues that the value of the property insured is $7.3 million, the limit of the blanket policy for all nine buildings.  Therefore, the Kansas Valued Policy Statute requires State Auto to pay $7.3 million for damage to any part of the apartment complex which is totally destroyed.  Neither argument is supported by the terms of the policy.

---

[1]The parties do not dispute that Kansas law applies to their contract for insurance.

6

Under Kansas law, an insurance policy is a contract. *See Judd Ranch, Inc. v. Glaser Trucking Servs., Inc.*, No. 06-1245, 2007 WL 1520905, at *3 (D. Kan. May 22, 2007). Construction and interpretation of insurance contracts is a matter of law determined by the court. *See Scott v. Keever*, 512 P.2d 346, 349-50 (Kan. 1973). "The risks insured against . . . under a policy of liability insurance are determined initially by the terms of the policy." *Isaac v. Reliance Ins. Co.*, 440 P.2d 600, 603 (Kan. 1968). The Kansas Supreme Court explains:

> If the language in an insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used. An insurance policy is ambiguous when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language. An ambiguity does not exist merely because the parties disagree on the interpretation of the language.

> To determine whether an insurance contract is ambiguous, the court must not consider what the insurer intends the language to mean. Instead, the court must view the language as to what a reasonably prudent insured would understand the language to mean. This does not mean that the policy should be construed according to the insured's uninformed expectations of the policy's coverage.

> Courts should not strain to find an ambiguity when common sense shows there is none. The court must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements.

> As a general rule, exceptions, limitations, and exclusions to insurance policies are narrowly construed. The insurer assumes the duty to define limitations to an insured's coverage in clear and explicit terms. To restrict or limit coverage, an insurer must use clear and unambiguous language. Otherwise, the insurance policy will be construed in favor of the insured.

*Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003) (citations omitted).

7

State Auto fails to point to any explicit language in the insurance policy limiting Boardwalk's recovery on Building 1 to $2.1 million. Moreover, this Court has found none within the policy's language, which does not mention anything but the $7.3 million blanket coverage, and which only incorporates the endorsements and declarations, not the Statements of Value. *See Van Enters., Inc. v. Avemco Ins. Co.*, 231 F. Supp. 2d 1071, 1081 (D. Kan. 2002) ("An insurance contract may thus consist of several separate documents. But statements in a collateral document do not become part of the contract of insurance unless they are so referred to therein as clearly to indicate that the parties intended to make them part of such contract." (citing *Thompson v. Harold Thompson Trucking*, 748 P.2d 430, 434 (Kan. Ct. App. 1987))). State Auto basically concedes that the policy's language does not contain any reference to the insurance cap for Building 1 when it argues that the Sloan Agency is Boardwalk's agent, and thus its knowledge about the worksheets should be imputed to Boardwalk. But it is the insurance policy's terms that are at issue here, not Boardwalk's knowledge. The ratings worksheets are only evidence, at best, of what State Auto thought was insured; however, that does not mean they were actually part of the insurance policy. Because the policy's language does not specifically reference the worksheets, they were not incorporated into the contract and do not limit the coverage of Building 1 to $2.1 million.

The Court also finds unpersuasive State Farm's argument that Boardwalk is bound by the $2.1 million valuation in the worksheets which were attached to the insurance policy and delivered to the Sloan Agency. Although Kansas law provides that attachments to a policy are deemed a part of the policy, *see Liberty Life Insurance Co. v. Guthrie*, 84 P.2d 891 (Kan.

1938), an insurance agent is generally the agent of the insurer for purposes of delivering the policy. *Marshel Invs., Inc. v. Cohen*, 634 P.2d 133, 139 (Kan. App. 1991). The Agency Agreement between the Sloan Agency and State Auto expressly provided that the Sloan Agency was State Auto's agent for that purpose, and given the way the policies were delivered, one for the insured without the underlying paperwork and one to the agent with the underlying paperwork, it is clear that the Sloan Agency was an agent of State Auto for purpose of delivery of the policy.

As to Boardwalk's argument that it is entitled to $7.3 million, neither side disputes that this is a blanket policy for $7.3 million. A blanket policy is:

> written upon a risk as a whole, embracing whatever articles or items are included therein. Such insurance is insurance in which every item of property described therein is covered to the whole amount of the policy; or insurance under which full indemnity must be paid for the destruction of any item covered by the policy, even though the loss exhausts the whole amount of the policy; or insurance covering property collectively without providing for a distribution of insurance as to each item in the event of a loss.

44 C.J.S. Insurance § 21.

Boardwalk contends that because Building 1 was "wholly destroyed," it is entitled to the full $7.3 million under the policy. Based on the plain language of the statute, though, this argument is without merit. Only one building out of nine buildings was completely destroyed, and seven buildings were not harmed at all. Because this was a blanket policy, "the property insured" is the entire apartment complex, which was not "wholly destroyed." Thus, the Valued Policy Statute neither limits coverage to $2.1 million nor requires the payment of $7.3 million.

9

## 2.    *Replacement Costs*

Both Boardwalk and State Auto admit that this policy provides for replacement costs. Boardwalk asks the Court for a declaration that it is entitled to replace Building 1 and that State Auto is liable for the full replacement cost of the building.  In contrast, State Auto claims that it is entitled to recover a portion of what has been paid to Boardwalk because Boardwalk is only entitled to the actual cash value of its losses until Building 1 is replaced and Building 4 is repaired.

The policy makes it clear that Boardwalk is only entitled to the actual cash value of its property until it replaces the property.  According to the policy:

> **G.    3.    c.**    You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis.  In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.
>
> **d.**    We will not pay on a replacement cost basis for any loss or damage:
>
> **(1)**    Until the lost or damaged property is actually repaired or replaced; and
>
> **(2)**    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

The plain language of the policy establishes that State Auto is not obligated to pay replacement costs "[u]ntil the lost or damaged property is actually repaired or replaced" and "[u]nless the repairs or replacements are made as soon as possible after the loss or damage."

10

Boardwalk admits that it has not replaced Building 1.  Therefore, plainly reading the policy's unambiguous terms, Boardwalk is not entitled to replacement costs under the policy until it actually replaces Building 1.  *See Burchett v. Kan. Mut. Ins. Co.*, 48 P.3d 1290, 1291 (Kan. Ct. App. 2002) ("This court and the courts of other jurisdictions when addressing this issue have otherwise unanimously held that actual repair or replacement is a precondition to recovery on a replacement cost policy.").

However, even though Boardwalk has not yet replaced Building 1, State Auto is not entitled, as a matter of law, to the reimbursement it seeks.[2]  This is because there is a material dispute of fact about the actual cash value of the damaged property which makes it impossible to determine at this stage of the litigation how coinsurance will be calculated.  Therefore, the Court cannot grant summary judgment to State Auto on its request for reimbursement.

Finally, Boardwalk asks for a declaration that it has a right to replace Building 1 and repair Building 4 even though a substantial period of time has elapsed since the fire.   State Farm objects, claiming that Boardwalk did not replace its property as soon as possible after the loss and therefore Boardwalk has forfeited its right to replacement.   The policy requires timely replacement and gives Boardwalk 180 days to elect replacement costs.  Although more

---

[2]In its motion, State Auto asserts that "Boardwalk is only entitled to the actual cash value of Building 1 until Building 1 is actually repaired or replaced."  Plaintiff's Sugg. in Supp. at 31.  State Auto then explains that since it has already paid Boardwalk $2,240,124.17 for the loss of Building 1 (including demolition costs), it has overpaid Boardwalk because the actual cash value of Building 1 is only $1,587,860.  As a result, State Auto requests that Boardwalk reimburse it $652,264.17.

Case 4:06-cv-00252-NKL   Document 158   Filed 02/15/08   Page 11 of 28

than 180 days have passed since the buildings were destroyed,[3] it appears that this 180 day limitation runs from the date of the resolution of disputes over coverage. *See, e.g., FB Ins. Co. v. Jones*, 864 S.W.2d 926, 928 (Ky. Ct. App. 1993) (where lawsuit is required to resolve coverage and valuation disputes, owner may reasonably wait until his rights have been determined before making repairs). Furthermore, no reasonable juror could conclude under these facts that Boardwalk unreasonably delayed replacing its property since State Auto filed its lawsuit before the 180 days even ran.[4] As a matter of law, Boardwalk has the right to replace Building 1 and repair Building 4 so long as it is done in a timely manner after the resolution of this litigation. The Court cannot say at this time that Boardwalk is entitled to full replacement cost once the building is replaced, because the calculation of the coinsurance clause is unknown at this time. As discussed below, the coinsurance provision applies to any replacements and, therefore, Boardwalk may not be entitled to the full replacement cost depending on how the coinsurance calculation is made.

### 3. Coinsurance

Section F.1 of the policy states:

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

**a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

---

[3]Building 1 was destroyed on October 7, 2005.

[4]State Auto filed its complaint on March 27, 2006.

Instead, we will determine the most we will pay using the following steps:

>   (1)    Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

>   (2)    Divide the Limit of Insurance of the property by the figure determined in Step (1);

>   (3)    Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

>   (4)    Subtract the deductible from the figure determined in Step (3).

>   We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

Boardwalk contends that the term "value" in Section F.1 refers to actual cash value and not replacement value. Thus, according to Boardwalk, there is no coinsurance penalty applicable to this claim because Boardwalk's appraiser determined that the actual cash value of the complex is less than the $7.3 million policy. State Auto argues that the term value in the coinsurance provision refers to actual cash value if the claim is for actual cash value and replacement cost if the claim is for replacement cost. State Auto's argument is supported *by Wenrich v. Employers Mutual Insurance Cos.*, 132 P.3d 970, 975-76 (Kan. Ct. App. 2006). In that case, the Kansas court held that there is no ambiguity in a coinsurance clause like this because the court was unable to conceive of any reasonable alternative meaning of the word value when a claim for replacement cost was being made. *Also see, Wetmore v. Unigard Ins. Co.*, 107 P.3d 123, 127-28 (Wash. Ct. App. 2005).

Case 4:06-cv-00252-NKL   Document 158   Filed 02/15/08   Page 13 of 28

Boardwalk urges this Court to disregard *Wenrich*, arguing it contravenes the clear rules of insurance construction of the Kansas Supreme Court. It does not. And while the Court agrees that a liability clause and a coinsurance clause may operate independently of each other, there is nothing requiring that they must operate independently. *See Carley Capital Group v. Fireman's Fund Ins. Co.*, 877 F.2d 78, 82 (D.C. Cir. 1989) ("Liability and coinsurance stipulations are whatever the parties choose to make them."). Other than its conclusory allegations that *Wenrich* is against Kansas Supreme Court law and that it is erroneously decided, Boardwalk provides no apposite contrary support.

Boardwalk is correct in noting that Section F does not define the word "value." But, it is inconsistent for Boardwalk to rely on the use of "actual cash value" in Section E.7 ("Loss Condition") for the meaning of "value" when it admits in its Counterclaim that Section G replaces the term "actual cash value" with "replacement cost." Additionally, Boardwalk's argument that because Section G only references Section E, it must not modify Section F, is without merit. As Boardwalk concedes, Section F does not define "value" at all, so the Court must interpret the insurance policy as a whole to find its meaning. *See Marshall*, 73 P.3d at 130. Section F.1.b further states: "If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies." As Example No. 3 under Section F illustrates, this means that the entire value of the property is taken into account in determining the coinsurance.

Looking at the policy as a whole, Section E.7 is the "Valuation" clause, which explains how State Auto "will determine the value of Covered Property in the event of loss or damage

14

. . . ."  By its terms, Section G replaces the phrase "actual cash value" in Section E.7 with "Replacement Cost."  Thus, replacement cost is the default valuation under the policy, unless Boardwalk elects to take the actual cash value.  Considering the whole policy, it is reasonable to read "value" in Section F to mean "replacement cost" when Boardwalk chooses replacement costs under Section G; in fact, contrary to Boardwalk's assertion, to read "actual cash value" into Section F, when that term had been excised and replaced in the Valuation clause, would lead to more confusion and strain otherwise unambiguous language.  *See Wetmore*, 107 P.3d at 128 ("But the Wetmores further claim that 'Replacement Cost' replaces 'actual cash value' only in the 'Valuation' subsection, not the undefined term 'value' in the 'Coinsurance' subsection.  This argument is unpersuasive.").

Thus, in the event Boardwalk's property was underinsured, the coverage for any damages will be subject to the policy's coinsurance clause.

### 4.    *Boardwalk's Counterclaims*

Summary judgment is granted in favor of State Auto on all of Boardwalk's counterclaims except to the extent Boardwalk requests a declaration that it has a right to replace Building 1, repair Building 4 and recover its lost business under the terms of the policy, even though more than 180 days have elapsed since the property was damaged by fire. Boardwalk has a right to such a declaration, therefore, summary judgment is granted in favor of Boardwalk on that issue.

### 5.    *State Auto's Estoppel Claim*

15

State Auto also asserts that Boardwalk should be estopped from claiming a replacement value of Building 1 in excess of $2,184,000. The record reflects, though, that Scott Baker, State Auto's underwriter, thought the replacement value listed on the Statement of Value was too low, and told the Sloan Agency (and presumably Boardwalk by extension) that it should raise the values; however, neither the Sloan Agency nor Boardwalk submitted another statement. This fact weighs heavily against reliance or an inducement to act. *See Gillespie v. Seymour*, 823 P.2d 782, 788 (Kan. 1991). Moreover, Example No. 1 under Section F of the Building and Personal Property Coverage Form clearly indicates that there might be situations where a property is underinsured. As a result, the coinsurance clause properly penalizes Boardwalk for any underinsurement. *See Carley Capital Group*, 877 F.2d at 82 (noting that role of coinsurance clause "is simply to decrease that liability if the demand specified in the clause is not met"). The insurance policy adequately addresses this issue, and no equitable remedy is appropriate under these circumstances.

### 6. *Law and Ordinance Limitation*

In its motion for partial summary judgment, Boardwalk states that Sections E.4.b, E.7.b and G.3.f–which limit the cost of repair or replacement by not including the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property–are void as against Kansas public policy. In support, Boardwalk cites a case from the Kansas Court of Appeals, which explained:

> The obvious result of any such construction [of the insurance policy] is the inescapable conclusion that defendants, having contractually undertaken to insure plaintiff's structures as school facilities, facilities known to be subject to the Building Code, have also assumed liability for the costs of complying

16

> with that Code upon loss. Thus defendants are liable, up to the limits of coverage, for the cost of plaintiff's necessary repairs, including any added costs in making those repairs occasioned by Code requirements.
>
> Turning to the trial court's second reason for rejecting defendant's argument [void for public policy], we find that the authorities dealing with the enforceability of attempted limitations of liability concerning building code or similar governmental requirements are comprehensively collected in an annotation at 90 A.L.R.2d 790. Although these authorities are somewhat divided, we find that those holding such limitations unenforceable are the more persuasive.

*Unified Sch. Dist. No. 285 v. St. Paul Fire & Marine Ins. Co.*, 627 P.2d 1147, 1154 (Kan. Ct. App. 1981). State Auto attempts to distinguish *Unified School District* on the grounds that it dealt with a total loss caused by an ordinance or law requiring the destruction of a building after only partial damage was done. State Auto also claims that *Unified School District* and other cases are not applicable in situations where there is only a partial loss, not a total loss.

Having reviewed 90 A.L.R.2d 790, which was relied on by the Kansas Court of Appeals in *Unified School District*, it appears most courts distinguish between situations where there is only a partial loss and where application of the ordinance or regulation would result in a total loss under a valued policy statute. *See Stahlberg v. Travelers Idem. Co.*, 568 S.W.2d 79, 85 & n.7 (Mo. App. 1978) (cited with approval in *Unified Sch. Dist. No. 285*, 627 P.2d at 1154) ("We distinguish cases in which the loss is only partial. In such cases of partial loss, the rule appears to be that exclusionary provisions limiting liability for loss resulting from the application of building laws or regulations are valid, even under valued policy statutes.").

17

In *Cohen Furniture Co. v. St. Paul Insurance Co. of Illinois*, 573 N.E.2d 851 (Ill. App. Ct. 1991), the Appellate Court of Illinois was faced with the question of whether the expense attributable to installation of a fire suppression system in a reconstructed building was excluded from replacement cost coverage under the policy. After reviewing both *Stahlberg* and *Unified School District*, the Illinois Court explained, "Courts in these states [with valued policy statutes] have limited the reach of these exclusionary provisions when insurers attempt to use them to limit their liability, in cases of a total loss, to less than the face value of the policy." *Id.* at 854.

In this case, the valued policy statute does not apply because there is only a partial loss; therefore, State Auto is not trying to limit its liability to less than the face value of the policy where it would otherwise be required to pay the full amount because application of the ordinance results in a total loss. Because there is not a total loss, the Law and Ordinance exclusion in the policy does not conflict with the purpose and policy of Kan. Stat. Ann. § 40-905(a)(1). As a result, the exclusionary provision is valid.

### B. Boardwalk's Third-Party Claim Against the Sloan Agency

Boardwalk filed a third-party complaint against the Sloan Agency, alleging negligent procurement of insurance (Count I); breach of fiduciary duty (Count II); and breach of contract (Count III). All of these claims are premised upon Boardwalk's allegation that the Sloan Agency was obligated to procure 100 percent replacement cost insurance coverage for Boardwalk, and if it is not entitled to 100 percent replacement from State Auto because the property was under insured, then it is entitled to get the difference from the Sloan Agency.

18

Boardwalk admits that an insurance agent normally only has a general duty to use reasonable skill, care and diligence, but it asserts that the Sloan Agency voluntarily agreed to assume a greater duty when it agreed to get *100 percent* coverage. The Sloan Agency moves for summary judgment on Boardwalk's third-party claims. Both parties agree that Missouri law governs their agency relationship. *See Inghram v. Mut. of Omaha Ins. Co.*, 170 F. Supp. 2d 907, 909-10 (W.D. Mo. 2001) (explaining Missouri applies most significant relationship test to determine choice of law).

Boardwalk's third-party claims fail as a matter of law, even assuming the facts viewed in the light most favorable to Boardwalk as outlined in its opposition brief:

> When TMS [Terrace] first asked TSA [the Sloan Agency] in 1996 to obtain property insurance for the Complex, Richard requested that TSA procure 100% replacement cost coverage for the Complex. Either David or Sloan or both assured Richard that TSA would do so, and Richard relied on that assurance. After each new policy was obtained, David assured Richard that 100% replacement cost coverage had been obtained. As TSA acknowledges, David asked for information relating to replacement cost, and Richard provided a copy of portions of an appraisal of the Complex performed at the requested of Commerce Bank in 1994, the only information regarding replacement cost that Richard had. Richard understood that TSA would use other information, in addition to the appraisal information he provided, in determining how much insurance coverage was needed to provide 100% replacement cost property coverage for the Complex. As David explained in his deposition, TSA did in fact use other information and, in 1997, determined what appeared to be appropriate monetary limits of the insurance coverage for Boardwalk.
>
> Richard has no independent knowledge or opinion regarding replacement cost for apartment complexes and has only a rudimentary understanding of insurance policies. In conversations over the years with David and Sloan, Richard told them that he was not an expert on determining replacement cost of an apartment complex or on insurance policies. David and Sloan did not have any reason to disbelieve Richard, and they knew Richard

19

would be relying on their expertise. David understood that Richard would take the advice of TSA in connection with obtaining 100% replacement cost coverage.

Each year since 1977 [sic], David recommended that Boardwalk renew the existing policy or select a policy from another carrier, and Richard accepted David's recommendation. David reviewed with Richard the limits of coverage and told Richard that each policy to be renewed or obtained by TSA provided the Complex with 100% replacement cost property coverage. At no time did David mention any exceptions to Richard, who relied on such statements or lack of disclosure.

Boardwalk's Sugg. in Opp. at 31-32 (citations to the record omitted).

Generally, "[a]n insurance agent or broker who undertakes to procure insurance for another for compensation owes a duty of reasonable skill, care, and diligence in obtaining the requested insurance." *Parshall v. Buetzer*, 121 S.W.3d 548, 553 (Mo. App. 2003) (citing *Manzella v. Gilbert-Magill Co.*, 965 S.W.2d 221, 225 (Mo. App. 1998)). "[I]nsurance agents or brokers have no general duty to advise an insurance customer of the amount of insurance necessary to cover the customer's needs." *Manzella*, 965 S.W.2d at 226. In *Manzella*, the court reasoned that generally the customer has the burden of taking care of her own financial needs and expectations before entering the marketplace to procure insurance coverage, and, if this duty were imposed on the insurance agent, "it would transform the insurance company into [the customer's] personal financial consultant or guardian." *Id.* Thus, the court declined "to impose a general duty upon an insurance agent or broker to determine the appropriate amount of insurance coverage for a customer." *Id.* at 227. The court noted that its decision was in accord with other courts which had "uniformly decline[d] to expand an insurance agent's duty to include a duty to advise about the availability or adequacy of insurance

20

coverage in the absence of a special relationship or extended agency agreement between the insurance agent and the customer." *Id*. (citing out-of-state cases). However, to the extent those out-of-state cases expanded the general rule to impose liability where there was a special relationship between the agent and the insured, the court explained that "no Missouri cases have adopted the expanded agency agreement concept." *Id*. at 228.

Despite the fact that Missouri courts have not adopted the expanded agency concept, the *Manzella* court addressed the question of whether the plaintiff in that case had established such a relationship. In that context, the *Manzella* court referenced two other cases, *Sandbulte v. Farm Bureau Mutual Insurance Co.*, 343 N.W.2d 457 (Iowa 1984), and *Jones v. Grewe*, 234 Cal. Rptr. 717 (Cal. Ct. App. 1987). *Sandbulte* held that there was an expanded agency agreement "when the agent holds himself out as an insurance specialist, consultant or counselor and is receiving compensation for consultation and advise apart from premiums paid by the insured." *Manzella*, 965 S.W.2d at 228 (citing *Sandbulte*, 343 N.W.2d at 464). The Missouri Court of Appeals explained:

> The *Sandbulte* court rejected the plaintiffs' assertion that an expanded agency agreement existed between them and their insurance agent because they had purchased insurance from the agent for several years and had requested the agent to provide "sufficient coverage" for them. The court held that merely purchasing insurance from an insurance agent for several years is insufficient to demonstrate an expanded duty on the part of the agent as part of an expanded agency agreement. Furthermore, the court noted that "[p]urchasers of insurance generally seek 'sufficient coverage.' To permit a conversation such as this to serve as the basis for an issue of fact leading to a finding of an expanded principal-agent relationship would in substance make the agent a blanket insurer for his principal."

21

*Id.* The *Jones* court held similarly. *See id.* (explaining longstanding relationship between insureds and agent, and request for "sufficient coverage," did not create expanded relationship and holding that "[i]t is the insured's responsibility to advise the agent of the insurance he wants, including the limits of the policy to be insured") (citing *Jones*, 234 Cal. Rptr. at 721)).

Boardwalk contends that once it told the Sloan Agency that it wanted "100 percent replacement cost coverage," it was solely up to the Sloan Agency to figure out the replacement cost for the apartment complex and secure the appropriate coverage. But that is not the law under *Manzella*, and the Sloan Agency was under no duty to advise Boardwalk of the exact dollar amount to replace the apartment complex. The mere fact that Boardwalk may have requested "100 percent" replacement coverage does not impose a duty on the Sloan Agency to investigate and determine the value of Boardwalk's assets. Instead, the Sloan Agency, using the information provided to it by Boardwalk, obtained a replacement cost insurance policy that it believed complied with Boardwalk's request.

Boardwalk argues an expanded relationship was established when the Sloan Agency reassured Boardwalk that it had obtained 100 percent replacement coverage. Boardwalk cites only non-Missouri caselaw, which is distinguishable. For example, *Free v. Republic Insurance Co.*, 11 Cal. Rptr. 2d 296 (Cal. Ct. App. 1992), is the most factually similar to the current situation. In that case, every year the plaintiff contacted his agent and inquired whether the coverage limits of his policy were adequate to rebuild his home; every time the agent informed him they were. *See id.* at 297. When fire destroyed his home, the plaintiff

22

learned that his home had substantially increased in the ten years since his original policy was issued, and that the policy limit was insufficient to replace his home. *See id.* The California court held the agency had assumed "additional duties" which required reasonable care "once they elected to respond to [plaintiff's] inquiries." *Id.* Here, Boardwalk claims that the Sloan Agency assumed additional duties when it assured Boardwalk that the policy would cover all the replacement costs; Boardwalk also argues that the Sloan Agency never mentioned an "agreed value" coverage option. *See Free*, 11 Cal. Rptr. at 298 (noting that special agency relationship existed because insurance company and agent assured plaintiff coverage was sufficient and did not inform plaintiff of other options). Missouri, though, does not recognize a duty on the part of insurance agents to advise customers as to their particular insurance needs or the availability of optional coverage. *See Jones v. Kennedy*, 108 S.W.3d 203, 207-08 (Mo. App. 2003).

Contrary to Boardwalk's position, several Missouri cases have stated that policy factors weigh strongly against shifting the burden for determining specific coverage limits from the insured to the agent, including:

> reluctance to remove the burden on the insured to attend to his/her own financial needs and expectations; potential to transform insurance companies from a competitive marketplace to financial counselors or guardians; knowledge of each insured regarding his or her own personal assets and ability to pay that far exceeds that of the agent; change would subject insurance agents to liability for failing to advise regarding every possible option, including that of competing companies; and insureds could then seek coverage for a loss after it occurred by merely alleging that they would have purchased the necessary coverage if it had been offered.

Case 4:06-cv-00252-NKL   Document 158   Filed 02/15/08   Page 23 of 28

*Id.* at 207 n.2 (citing *Farmers Ins. Co. v. McCarthy*, 871 S.W.2d 82, 85-86 (Mo. App. 1994));

*see also Manzella*, 965 S.W.2d at 225-26 (discussing *Farmers Insurance*). Boardwalk offers

no reasonable justification for ignoring Missouri's well-established policy against shifting

this burden to insurance agents. *Manzella* implies that in order for there to be an expanded

agency relationship, the agent must hold itself out as "something more" than a regular

insurance agent. *See Manzella*, 965 S.W.2d at 228 (explaining there was no evidence that

insurance agent "held itself out to be an expert on insurance matters or was paid anything

more than normal insurance premiums"). Thus, if the Sloan Agency had held itself out as

providing additional financial counseling, it could be argued that the burden for determining

replacement costs should be shifted to the agency. That is not this case. There is also no

evidence that the Sloan Agency received more than normal insurance premiums. *See Jones*,

108 S.W.3d at 207 n.2.

  All of the policy reasons stated in *Farmers Insurance* are applicable here. At best,

Boardwalk and the Sloan Agency had equal amounts of information regarding the value of

the apartment complex. However, simply requesting "100 percent replacement cost"

insurance was not enough to shift Boardwalk's burden of managing its financial needs to the

Sloan Agency. If it were, it would open up insurance agents to being liable for every time

they failed to secure "100 percent replacement coverage," even where they had every

expectation that they had done so.

  For these reasons, the Court finds that the Sloan Agency did not owe Boardwalk a

duty to correctly calculate the replacement cost of Building 1, and summary judgment is

granted for the Sloan Agency on Count I (negligent procurement of insurance) and Count II (breach of fiduciary duty).  *See Jones*, 108 S.W.3d at 208.  Finally, Boardwalk alleges in Count III that there was an oral agreement by the Sloan Agency to procure "100 percent replacement cost" insurance coverage.  Again, because there was no duty, Boardwalk cannot recover under Count III (breach of contract); therefore, summary judgment is granted for the Sloan Agency on all of Boardwalk's claims.

Because the Court grants summary judgment in favor of the Sloan Agency on all counts, its motion for continuance is moot.

### C.     **Boardwalk's Motion in Limine**

Finally, Boardwalk raises a *Daubert* challenge to the testimony of Patrick Bello regarding the replacement cost and depreciation of Building 1.  Boardwalk contends that Bello's testimony as to value should be excluded because his proposed opinions are outside the scope of his expertise as an adjuster, because it cannot be determined whether his opinions are the product of reliable principles and methods, and because he cannot apply the principles and methods of property valuation and construction cost estimation to the facts.

Federal Rule of Evidence 702 requires the Court to make a determination as to whether a witness qualified as an "expert by knowledge, skill, experience, training, or education" may give opinion testimony if, and to the extent, "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  It is the role of the district court to make certain that certain testimony admitted under Rule 702 "is not only relevant, but reliable."  *Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 589 (1993); *see also Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 309 (8th Cir. 1997).

Bello has been a claims adjuster for approximately 20 years, in which time he has adjusted hundreds of fire claims. He conducted his own inspection of the Boardwalk apartment complex. In his deposition, Bello testified that valuation of property, including reconstruction costs, is a necessary part of an adjuster's business operations. The fact is that as an adjuster, valuation is a part of Bello's job. Thus, it is not outside the scope of his expertise to testify as to the value of Building 1. *See Cincinnati Ins. Co. v. Bluewood, Inc.*, No. 06-4127, 2007 WL 4365738, at *4 (W.D. Mo. Dec. 12, 2007) (holding that court properly allowed testimony of claims adjuster regarding valuation of defendant's loss); *see also, e.g., Carlisle Corp. v. Med. City Dallas, Ltd.*, 196 S.W.3d 855, 867 (Tex. App. 2006) (holding property adjuster "was qualified to testify to the replacement cost of the new foam roof").

But, in an argument apparently made for the first time in its reply, Boardwalk claims that even if an adjuster, in general, may testify as to valuation, in this case Bello may not because he relied on the opinions of another expert, Stu Van Gorp. "Rule 703 permits an expert to 'rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field.'" *Sosna v. Binnington*, 321 F.3d 742, 746 (8th Cir. 2003) (quoting *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997)). It is admitted that Bello relied on Van Gorp's compilation of data regarding replacement costs. Boardwalk states that this

26

reliance was not "reasonable" because Bello could not explain the anomalies in Van Gorp's analysis, and that Rule 703 requires an expert to have familiarity with the methods or reasoning used by the other expert. *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993). But Bello has familiarity with the Xactimate program used by both him and Van Gorp; in fact, he explained in detail how the program works. Boardwalk's complaints actually relate to the factual basis of Bello's testimony which goes to weight, not admissibility. *See Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (citing *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 864 (8th Cir. 2004)). Boardwalk, if the case goes to trial, will have the opportunity to cross examine Bello regarding the factual basis of his opinions, and it will be up to the jury to evaluate credibility.[5] *See id.* Boardwalk's motion in limine is denied.

## IV. Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff State Auto Property and Casualty Insurance Company's Motion for Summary Judgment [Doc. # 109] is GRANTED, in part. It is further

ORDERED that Third-Party Defendant T.S.A., Inc.'s Motion for Summary Judgment [Doc. # 111] is GRANTED. It is further

ORDERED that Defendant/Third-Party Plaintiff Boardwalk Apartments L.C.'s Motion for Partial Summary Judgment [Doc. # 115] is GRANTED, in part. It is further

---

[5]It is unclear to the Court what issues, if any, are left for trial. It may be that Boardwalk's Motion in Limine is moot. The Court has addressed the issue in the event that the testimony remains relevant.

Case 4:06-cv-00252-NKL   Document 158   Filed 02/15/08   Page 27 of 28

ORDERED that Defendant/Third-Party Plaintiff Boardwalk Apartments L.C.'s Motion in Limine to Preclude the Testimony of Patrick Bello as to the Value of Building 1 [Doc. # 114] is DENIED. It is further

ORDERED that Plaintiff State Auto Property & Casualty Insurance Company's Motion for Leave to File Its Sur-Reply Suggestions in Opposition to Defendant's Motion in Limine [Doc. # 145] is DENIED AS MOOT. It is further

ORDERED that Third-Party Defendant T.S.A., Inc.'s Motion for Continuance [Doc. # 149] is DENIED AS MOOT.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: February 15, 2008
Jefferson City, Missouri

Case 4:06-cv-00252-NKL   Document 158   Filed 02/15/08   Page 28 of 28